UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Jeffrey Willis,              )
     Plaintiff         )
                 )
          v.      )      Case No. 11-1208
                 )
BNSF Railway Company,  )
     Defendants    )
                 )

**ORDER and OPINION**

Now before the Court is the Defendant's motion to exclude testimony of the Plaintiff's expert Dr. George Crickard III. The motion is fully briefed, and I have carefully considered the arguments of the parties. As stated herein, the motion is denied.

I. BACKGROUND

Plaintiff Jeffrey Willis is employed by BNSF Railway Company as a conductor. On April 22, 2009, Willis was tying down (or setting) a handbrake on a railcar. A handbrake is operated by turning a wheel clockwise; this tightens a chain, which applies the brake against locomotive's wheels. See, *Richardon v Consolidated Rail Corp.* 17 F3d 213, 215 (7th Cir 1994). As Willis turned the wheel, it slipped and he felt a "pop" in his shoulder. He reported to the trainmaster later that day that he had "felt a little pop" in his shoulder while tying a handbrake, but he did not seek medical treatment that day.

The next day, Willis saw a nurse practitioner, who diagnosed him with "shoulder pain and right shoulder strain." The practitioner scheduled a follow up appointment with Dr. Crickard for two weeks later. At that appointment, Willis reported the same thing: he felt a pop in his right shoulder as he was tying a hand brake at work for BNSF. Willis described the process of tying a handbrake, explaining to the doctor that it involved

1

turning a wheel with his right hand and right arm. Willis also told the doctor that he had had no previous shoulder pain.

Dr. Crickard ordered and reviewed an X-ray and an MRI. The MRI showed a partial tear of one of the rotator cuff muscles. It also showed mild osteoarthritic changes in the ball and socket of the shoulder and the collar bone. He initially treated Willis with cortisone injections and physical therapy, but those brought little improvement. By June, Dr. Crickard diagnosed right shoulder impingement and right shoulder rotator cuff tendinitis.

On July 1, 2009, Dr. Crickard performed arthroscopy[1] to see whether there was anything else that his examinations and tests had not picked up. Dr. Crickard was able to see that, while the rotator cuff was intact, it showed some "undersurface fraying," which the doctor described as being similar to an area on a t-shirt that starts to wear out – it gets thinner but doesn't have an actual hole. He testified that this type of fraying can result from an acute incident or it can develop slowly over time. He could not "put a time limit on when" it had first occurred.

He also observed arthritic changes, which included a hook-like bone spur. He removed the spur, thereby creating more room for his irritated muscle to move within the joint. Dr. Crickard opined that the bone spur "more than likely developed over time. It's the pain in the shoulder that was the acute injury and acute incident."

While the arthroscopy created more room for Willis' irritated muscle to move within the shoulder joint, it did not correct the irritation or damage to the muscle itself, which remained irritated. The damage to the rotator cuff could not be surgically repaired.

---

[1] Arthroscopy is partially diagnostic; it involves insertion of a camera so the shoulder joint can be viewed. It is also therapeutic; the physician is able to perform certain procedures.

Despite the arthroscopy and continuing treatment with cortisone injections and physical therapy, designed to target the pain, irritation and inflammation, Willis' pain nonetheless continued. The pain has never fully abated, and Dr. Crickard believes Willis will never be completely without pain.

In this FELA action Plaintiff has identified Dr. Crickard as an expert witness on, *inter alia*, causation.[2] In his deposition, Dr. Crickard testified about his treatment and diagnosis of the Plaintiff. As to the changes he saw to the rotator cuff, he stated that they could have resulted from an acute incident or it could have developed slowly over time. The bone spur he saw was "more than likely developed over time." He was "absolutely" certain that the pain Willis developed in his right shoulder was "directly related to the injury he sustained at work" on April 22, 2009, stating that the "pain in the shoulder …was the acute injury and acute incident,"

## II. APPLICABLE LAW

### A. FELA

Willis alleges violations of the Federal Employees Liability Act (FELA) and the Federal Safety Appliance Act (FSAA). FELA is a general negligence statute; in and of itself, it "neither prohibits nor requires specific conduct by a railroad." *Waymire v Norfolk & Western Railway Co.*, 218 F3d 773, 775 (7th Cir 2000). The FSAA imposes an absolute duty on railroads to provide safe equipment. *DeBiasio v Illinois Central RR*, 52 F3d 678, 683 (7th Cir 1995). The FSAA does not itself create a private right of action, rather it allows employees injured by violations of the FSAA to sue under FELA. *Crane v Cedar Rapids & Iowa City Railway Co.*, 395 US 164 (1969).

---

[2] Dr. Crickard did not produce an expert report because he was a treating physician. Under Rule 26, only experts retained specifically for trial testimony must produce a report.

In order to recover under FELA, a plaintiff must first prove actual negligence; a violation of FSAA is negligence as a matter of law. *Urie v Thompson*, 337 US 163, 189 (1949). Hence, proof of a violation of FSAA is sufficient; there is no necessity to prove that the violation constitutes negligence.

A plaintiff must also prove that his injury was caused by the FSAA violation, although causation under FELA is *not* the ordinary standard of proximate causation. Liability is established when "the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury … for which damages are sought." *Rogers v Missouri Pacific Railroad Co.*, 352 US 500, 506 (1957). See, *McBride v CSX Transportation, Inc.*, 598 F3d 388 (7th Cir 2010), aff'd *CSX Transportation, Inc., v McBride*, 131 SCt 2630 (2011) ("relaxed" standard of causation under FELA); *Gallick v Baltimore & Ohio Railroad Co.*, 372 US 108 (1963) (upholding jury verdict for plaintiff who lost both legs due to infected insect bite based on employer negligence in maintaining a stagnant pool of water that attracted insects and vermin).

B. EXPERT TESTIMONY AND *DAUBERT*

Rule 702 of the rules of Evidence provides that an expert may offer opinion testimony if:

> a. the expert's scientific, technical or other specialized knowledge will assist the jury to understand evidence or to determine a fact in issue;
> b. the testimony is based on sufficient facts or data;
> c. the testimony is the product of reliable principles and methods; and
> e. the expert has reliably applied the principles and methods reliably to the facts of the case.

*Id*.

In *Daubert v Merrell Dow Pharmaceuticals Inc.*, 509 US 579 (1993), the Supreme Court set out a three part analysis for determining whether an expert's

testimony is admissible. First, the trial court must determine that the expert is qualified to provide an opinion on the subject. Second, the court must conclude that the expert's methodology is reliable. Third, the court must agree that there is a connection between the methodology and the opinion. *Id* at 589-92. See also *Myers v Ill. Cent. RR Co.*, 629 F3d 639, 644 (7th Cir 2010).

The proponent of an expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert standard. Lewis v CITGO Petroleum Corp.*, 561 F3d 698 (7th Cir 2009), citing *Bourjally v US*, 483 US 171, 175-76 (1987).[3]

The district court has significant latitude in determining how to measure the reliability of the proposed expert and whether the testimony is in fact reliable. *Gayton v McCoy*, 593 F3d 610, 616 (7th Cir 2010). Nonetheless, the court must provide "more than just conclusory statements" about admissibility to show that it properly performed its gatekeeping function. *Id.* The admissibility determination is not intended to supplant the adversarial process, and so even "shaky" testimony may be admissible. *Id.* See also, *Ortiz v City of Chicago,* 656 F3d 523, 536 (7th Cir 2011), citing *Daubert*, 509 US at 596.

In the context of a FELA case, the lower standard of causation is an issue entirely distinct from Daubert's standards for admission of expert testimony. *Myers*, 629 F3d at 643. Expert testimony is still needed to show causation in FELA cases, unless the causal link is so obvious a layperson can understand it, as, for example, when the plaintiff

---

[3] *Bourjally* dealt with admissibility of evidence before a jury in a criminal case. *Lewis* applied *Bourjally* to the summary judgment stage in a civil case without any discussion. Nonetheless, after *Lewis*, courts in this Circuit place the burden on the party proffering the expert, rather than on the party moving to exclude the expert and/or his testimony See, e.g., *Estate of Carlock v. Williamson*, 2012 WL 5386136 at *5 (CD IL) (D.J.Myerscough); accord, *Goldberg v 401 North Wabash Venture LLC*, 2013 WL 212912 at *1 (ND IL); *Cunningham Charter Corp. v Learjet Inc.*, 2012 WL 1565535 at *3 (SD IL).

suffered a broken leg when hit by a vehicle. *Id,* citing *Claar v Burlington Northern Railroad Co.*, 29 F3d 499, 503 (9th Cir 1994). See also, *Wills v Amerada Hess Corp.*, 379 F3d 32, 47 (2nd Cir 2004) (*Daubert* applies regardless of whether the causation standard is lowered).

Rule 702 does not distinguish a treating physician from other experts when the physician is offering expert testimony on causation. *McCann v. Illinois Central Railroad Co.*, 711 FSupp2d 861, 868 (CD Ill 2010), quoting *O'Connor v. Commonwealth Edison Co.*, 13 F3d 1090, 1105 n.14 (7th Cir 1994).

### III. DISCUSSION

Defendant has filed a motion challenging Dr. Crickard's opinion on causation.[4] The Railroad asserts that Dr. Crickard's opinion about causation must be rejected because it is not based on sufficient facts or data, nor is it sufficiently grounded in scientific methodology. It is important to keep in mind exactly what Dr. Crickard's opinion was: that Plaintiff's pain was caused by his setting the handbrake on April 22.

The first prong of Daubert analysis requires a determination that the expert is qualified to provide an opinion on the subject. Defendant raises no objections to Dr. Crickard's qualifications and the Court finds none.

The second prong requires an examination of the expert's methodology and a finding that it was reliable. Defendant points to *Myers v Illinois Central Railroad Co.*, 629 F3d 639 (7th Cir 2010) for guidance on this question. In *Myers*, the plaintiff had worked for the defendant for 30 years. During that time he had suffered a number of knee, elbow, back and neck injuries that forced his retirement. He sued the railroad, claiming that these disorders were caused by the railroad's negligence. He tendered

---

[4] No challenge to Dr. Crickard's qualifications is presented.

reports from 4 expert witnesses: a retained ergonomist and 3 treating physicians. The district court barred all 4 experts, and plaintiff appealed.

The Seventh Circuit began by affirming that a plaintiff must have expert testimony to establish causation, unless the injury is one that is so obvious that causation would be obvious to a layman. *Id.* at 642-43. W[W]hen there is no obvious origin to an injury and it has "multiple potential etiologies, expert testimony is necessary to establish causation." *Id.* at 643, quoting *Wills,* 379 F3d at 46-47 and citing *Claar,* 29 F3d at 503. Neither Myers nor his doctors could point to a specific injury or moment that brought on his knee, elbow and back and neck problems; instead, they claimed that his injuries were "cumulative trauma injuries," brought on by years of physically demanding work duties. The Court of Appeals concluded that "determining what caused [an injury of this nature] is not usually obvious to a layman," it requires expert testimony.

Unlike the situation in *Myers*, the Plaintiff and Dr. Crickard point to a single, discrete event that marked the onset of his pain. It was pain that drove Plaintiff to the doctor, and pain that the doctor was treating. It is at least arguable that expert testimony is not even needed under this scenario because the causation issue is one of simple common sense.

Assuming, however, that expert testimony on causation is needed, Dr. Crickard's methodology must be reviewed. In *Myers*, the District Court had found that the physicians lacked knowledge of Myers's medical history and railroad duties. As a result, their causation opinions were not based on facts and were inadmissible. On appeal, the Myers argued that the doctors used "differential diagnosis" and that their ignorance of job

duties should have been explored on cross-examination rather than forming the basis for excluding their testimony.

The Seventh Circuit defined differential diagnosis and noted that the issue was not the *diagnosis* of Myers' ailments but the *causation* of those aliments, which requires differential etiology. *Id.* at 644. In the former, a physician "systematically compares and contrasts clinical findings from a patient's medical history to determine which of two or more diseases with similar symptoms is the one from which the patient is suffering." *Id.* In the latter, "the doctor rules in all the potential causes of a patient's ailment and by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment. *Id.*

Neither method is controversial; the question is whether, in a particular case, the methodology is reliable. In *Myers*, the Court found that the physicians had not applied the methodology reliably. For example, the physician who had performed back surgery did not know about Myers' earlier back injury and admitted that this would have been an important consideration. He also admitted that he had not explored Myers job duties or considered how they might have affected his causation opinion. The Court concluded that the doctors' causation opinions were based on common sense, not on any medical methodology.

In this case, Dr. Crickard was aware of an acute event – Willis' shoulder popped while he was setting the hand brake. Dr. Crickard had a general description of what that entailed, although he did not know exactly what a handbrake was and had never set one himself or seen one set by someone else. He also knew that Willis had not suffered from any shoulder pain before his shoulder popped. During questioning, Dr. Crickard testified

that Willis' weight, gastric bypass, or physical therapy had not been "ruled in" because there was nothing connecting them with the sudden onset of pain on April 22. He testified that he had considered that the osteoarthritis and tendinitis were potential causes of pain but ruled them out because, once again, Willis had not noted pain before April 22.

The Seventh Circuit in *Myers* commented that if differential etiology is used and the physician is unaware of aspects of work conditions, "that doesn't necessarily mean the expert should be struck." *Id.* But where a physician knows "little or nothing" about work conditions, then it cannot be said that he is engaging in differential etiology. *Id.* In other words, it all depends on how much the doctor knows about the patient's work duties and whether his knowledge is accurate.

Defendant would have this Court require that the physician understand every detail – perhaps even have personal knowledge - about the work Plaintiff was doing when he felt the "pop" in his shoulder. For example, Defendant asserts that, in order for Dr. Crickard to opine on causation, he would have had to know such things as the specifics of Willis' job duties, the physical requirements of those duties, the forces involved in tying a handbrake, or the forces required to cause the injury, or perhaps that he had relied on literature to support his opinion, measured the forces involved, or relied on scientific studies.

The Court knows of no requirement that a treating physician have such detailed non-medical information in order to opine on medical causation, at least not where, as here, there is a single discrete event. The cases on which Defendant relies for this proposition are cases, like *Myers, supra,* in which the plaintiff's theory was based not on a single event but on years of physical labor.

That is not to say that work conditions are immaterial but rather that work conditions may – or may not- be pertinent when the physician utilizes a differential etiology methodology. The extent of the physician's knowledge about those conditions will vary depending on the type of case. Where, as here, there was a general knowledge about the specific duty and there was a single discrete event, an in-depth knowledge and rigorous scientific application of the laws of physics, for example, would not be necessary for a treating physician to opine on causation.

Experts generally do not have to base their opinions on personal knowledge or observation. FRE 703. An expert may rely on facts that he has been made aware of, and those facts do not even have to be admissible. *Id.* As noted above, Plaintiff described the process of tying the handbrake to the doctor. Although his description was general, the description was sufficient for the doctor to connect the newly reported pain to that event.

Under FELA's relaxed causation standard, an employee can recover when a single traumatic event activates or aggravates a previously latent condition or made it symptomatic. *Cella v. US*, 998 F2d 418, 428-29 (7th Cir 1993); Accord, *Aldridge v Baltimore & Ohio Rail Co.*, 789 F2d 1061, 1065 (4th Cir 1986). The fact that Dr. Crickard was unable to connect the underlying conditions of osteoarthritis or tendinitis to the April 22 incident is therefore insignificant. He was clearly and definitively able to opine about the causal connection between the symptom – pain – and the event of April 22.

Dr. Crickard's opinion was the result of a reasoned process based on the facts that he thought were pertinent. While there may be shortcomings in the methodology and its application to the facts, those shortcomings may be explored on cross examination. They

are not fatal to his methodology and do not provide a basis for eliminating his causation opinion.

## IV. CONCLUSION

For these reasons, I find that Dr. Crickard's causation opinion meets the tests set forth in Daubert. The Defendant's motion to bar that opinion [#44] is accordingly DENIED.

ENTERED: March 7, 2013

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE